**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) Case No. 17-mj-00081-JTM-01 |
| | ) |
| **Plaintiff,** | ) **Kansas City, Missouri** |
| | ) **May 5, 2017** |
| **v.** | ) |
| | ) |
| **ISSE AWEIS MOHAMUD,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**TRANSCRIPT OF HEARING ON INITIAL APPEARANCE
BEFORE THE HONORABLE SARAH W. HAYS
CHIEF UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

For the Plaintiff:             Mr. David Raskin
                               Assistant United States Attorney
                               400 E. Ninth St., Ste. 5510
                               Kansas City, MO  64106
                               (816) 426-3122

For the Defendant:            Ms. Carie Allen
                               Federal Public Defender's Off.
                               818 Grand Blvd., Ste. 300
                               Kansas City, MO  64106
                               (816) 471-8282

Court Audio Operator:         Ms. Traci Chorny

Transcribed by:               Rapid Transcript
                               Lissa C. Whittaker
                               1001 West 65th Street
                               Kansas City, MO  64113
                               (816) 914-3613

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1    (Court in Session at 3:38 p.m.)

2    THE COURT:  All right.  Good afternoon.  We're here on

3    Case No. 17-mj81-JTM.  If counsel would state their appearance

4    for the record.

5    MR. RASKIN:  David Raskin for the Government.  Good

6    afternoon, Your Honor.

7    THE COURT:  Good afternoon.

8    MS. ALLEN:  Carie Allen for Isse Mohamud who appears in

9    person.

10   THE COURT:  All right.  We're here today for the initial

11   appearance.  And then to the extent -- we've had some e-mail

12   communications back and forth -- the parties are ready we will

13   get started on the Government's Motion for Detention.  Let me

14   first just review with the defendant the Complaint that alleges

15   as follows:  "I, the undersigned complainant, state the following

16   is true and correct to the best of my knowledge and belief.  From

17   on or about January 27, 2017, up to and including May 4, 2017, in

18   the Western District of Missouri and elsewhere, Isse Mohamud, the

19   defendant, did willfully and knowingly make a false statement in

20   an application for passport with intent to induce and secure the

21   issuance of a passport under the authority of the United States

22   for his own use, contrary to the laws regulating the issuance of

23   passports and the rules prescribed pursuant to such laws, and did

24   willfully and knowingly use a passport, the issue of which was

25   secured in any way by reason of a false statement in violation of

18 United States Code Section 1542."  The facts in support of

that Criminal Complaint are then contained in an affidavit that

is three pages long and attached.  Ms. Allen, it's not my intent

to read that affidavit to the defendant, but he has a copy and

can review it at his convenience if that's satisfactory.

MS. ALLEN:  Yes, it is, Your Honor.

THE COURT:  The penalty that this charge carries is not

more than ten years in prison, not more than a $250,000 fine, not

more than three years supervised release and a $100 mandatory

special assessment.  You have the right to remain silent.  But if

you make a statement, plan it would be used against you.  You

have the right to hire a lawyer that you choose and pay for.  But

at your request I can appoint a lawyer to represent you free of

charge.  It was our understanding you were seeking court-

appointed counsel, so I asked Ms. Allen to be present today.  But

on the record I do need to ask if you wish court-appointed

counsel.

(Off Record Talking)

MR. MOHAMUD:  Yeah.

THE COURT:  All right.  Then it will be up to Ms. Allen

to file a financial affidavit showing that you qualify for court-

appointed counsel.  The Government is seeking your detention

pending trial.  And for a variety of reasons, which we can

discuss on the record if we need to, the Court went ahead because

Pretrial was able to get out a report today and we set the

1  detention hearing.  Are the parties ready to proceed with that

2  hearing?

3          MR. RASKIN:  Of course we're ready to proceed.  Yet, as

4  Your Honor knows, we filed a Motion for Continuance expecting

5  several days to continue what is an ongoing investigation before

6  presenting evidence on the issue of detention.  I can elaborate

7  on why the Government filed that motion and why we continue to

8  think it is important to have that extra time before the

9  detention issue if Your Honor would like to hear that now.

10          THE COURT:  Yes, please.

11          MR. RASKIN:  So, the charge in the Complaint is a very

12 straightforward one, and as Your Honor knows, is not on its face

13 the type of charge that merits pretrial detention.  But there is

14 much more to this story than the Complaint would indicate on its

15 face.  And I'll address that now and it'll be addressed at the

16 hearing by Special Agent Buono who is with me at this table.  The

17 defendant -- well, the defendant came to the FBI's attention

18 around April of this year, April 25th of this year, just a couple

19 weeks ago.  He came to the FBI's attention because his family

20 reported him missing.  He's a resident of the Kansas City area.

21 An investigation began because the family was concerned that he

22 may have gone overseas to engage in jihadist activities.  I'm

23 summarizing there, of course.  But that was the sentiment that

24 the family expressed.  The FBI and its Joint Terrorism Task Force

25 got involved and it was quickly determined that the defendant

had, the day before, on April 24th left the United States on a

flight from Kansas City to Alexandria, Egypt.  The FBI

investigated first by talking to his employer and learned from

his employer, an employee at Walmart, that the defendant had

actually left for the airport in the middle of his shift at

Walmart on the day of the 24th.  FBI talked to a taxi driver who

drove him to the airport who expressed concern that the defendant

said he was leaving for three months.  He had only had a small

backpack with him.  The FBI talked to family members subsequently

who reiterated their concern about what the defendant was doing

overseas.  The brother also mentioned that in the past several

months the defendant had cordoned off the garage of the house for

his own use, installing a lock on the door and that the brother

was concerned about what the defendant was doing alone in the

garage because he could hear the defendant having conversations

with people and didn't necessarily know the substance of those

conversations or who the people were who he was conversing with.

But the conversations themselves and the circumstances of the

privacy surrounding those conversations gave him concern.  The

brother also told the FBI that the defendant had wiped clean some

electronic devices that had access to social media, or I believe

it may have been a laptop, which was cause for further concern

for the FBI.  The FBI did some investigation of his travel and

learned that several flights to Egypt had been booked and not

taken before the one the defendant eventually took.  There was

1  also a flight to Canada, as Your Honor knows, it's referenced in

2  the affidavit to the Complaint that it was booked and not taken.

3        THE COURT:  Well, I don't mean to stop you, Mr. Raskin,

4  and I'll certainly let you proceed.  But it seems to me these are

5  the kinds of facts that you could present today at the hearing as

6  opposed to presenting those same facts as a basis for getting a

7  continuance.

8        MR. RASKIN:  Sure.  Your Honor, I mean, there are -- I

9  can go on.  But the point here is that there are serious

10  questions about what in God's name this defendant was doing

11  leaving his family without notice and his job without notice in

12  the middle of day and flying Egypt.  That raises serious concerns

13  for the FBI.  And those concerns go directly to the question of

14  bail.  They go to danger to the community and they go to risk of

15  flight.

16        THE COURT:  Okay.

17        MR. RASKIN:  And the reason we asked for a continuance,

18  Your Honor, is because the FBI currently does not have the

19  answers to those questions, not necessarily bearing on passport

20  fraud, but bearing on the issue of whether this defendant can be

21  released without causing a risk of danger to the community or a

22  risk of not returning to court.  That's why we asked for the

23  continuance and that's why we need it because we're still doing

24  work to figure out what is going on here.

25        THE COURT:  Well, as I indicated in the e-mail that I

1  sent to both counsel -- and in just a moment I'll let Ms. Allen

2  speak as well -- you may have significant concerns as to what the

3  defendant was doing overseas.  The Court has significant concerns

4  as to whether the affidavit itself established probable cause for

5  the charge in question.  And what I did, because this is Judge

6  Maughmer's case, is I went ahead, you know, based on the

7  arguments that you presented, and signed the Criminal Complaint.

8  But because of the Court's concern, and I've certainly done this

9  in the past when I have had other similar cases where I'm

10 concerned about the legal basis for the charge, I hold the

11 detention hearing immediately.  While I understand the Complaint

12 itself tracks the language of the statute, in the affidavit in

13 support of the Complaint, if you look at Paragraph 8, based on

14 the facts submitted above, the agent says, "I submit there is

15 probable cause to believe that Mohamud's statement in the

16 application regarding his intention to travel to Canada was

17 intentionally false.  I, therefore, believe that probable cause

18 exists for the issuance of a Criminal Complaint charging him with

19 passport fraud in violation of 18 U.S.C. Section 1542."  What the

20 Court views is lacking there is a statement that this false

21 statement was made with the intent to induce the issuance of the

22 passport as opposed to having been made for some other reason.

23 And if you look at the cases under this passport statute,

24 generally, the fraud involved -- it involves -- it can involve

25 many things, but the birth certificate itself, a Social Security

1  number, or something that if it had been presented would have

2  meant that the passport did not issue.  So, the Court is

3  concerned when you look at the jury instructions that are

4  required on §1542 cases that have gone to trial with what I view

5  as a concern over the intent to induce the issuance of the

6  passport.  And as you articulate your concern about the serious

7  questions as to what the defendant was doing, it's not the

8  Court's role to detain someone so that you can continue to

9  investigate some other crime that you think may have been

10 committed.  And when you talk about the fact that there are

11 serious issues of danger to the community, unfortunately, under

12 the statute that you have chosen to charge this defendant, the

13 issue is is he a risk of flight.  This is not one of the ones

14 under §3142, I believe it's (f)(1), where it's a crime of

15 violence or any of those other things that allows you to raise

16 issues of a danger or flight risk.  So, the Court's concern -- I

17 certainly understand your concern, but I don't believe the Court

18 can be used as a holding ground while you further investigate

19 other crimes that may allow you to make other motions under the

20 detention statute.  And that's why I set this this afternoon and

21 thought we should go forward.  And if there is some piece of

22 evidence that you do not have and cannot present this afternoon,

23 then I'm happy to consider whether we should continue it over

24 until Monday.  Ms. Allen, I know you've been asked to appear on

25 short notice.  Do you want to weigh in on these issues?

1    MS. ALLEN:  Judge, simply that we would be ready to

2  proceed with the detention hearing today.  And that would

3  obviously be our preference based on the fact that he is being

4  held and would be held over the weekend until Monday if we

5  prolonged this.

6    THE COURT:  All right.  So, I suggest we get started.

7  And then if there's something that you think is of great

8  significance that we cannot -- do not have evidence for this

9  afternoon, then I'm happy to consider whether the matter should

10  be continued.

11    MR. RASKIN:  Well, just to complete the record and we'll

12  go forward with the hearing, you know, we're in a bind because

13  we're continuing an investigation.  Not necessarily about new

14  crimes, but just about what this defendant was up to as it

15  relates directly to the safety of the community while he is on

16  release.  Whether that is a factor or not it means nothing to the

17  FBI.  They have a responsibility to keep the community safe.  And

18  so they are going to be investigating that.  And it's very hard

19  for us to give Your Honor the specifics of what exactly the FBI

20  is looking at now without compromising that investigation.  So,

21  you've put us in a very, very difficult position going forward

22  before we're ready to present the most compelling case for

23  detention here in a case that, frankly, is quite important to us.

24    THE COURT:  Well, I understand the importance of the

25  case.  I mean, you could have held up filing these charges.  I

mean, you were the one that chose to go forward today. It's my understanding defendant has been detained for some time. I think Pretrial indicated he's been in custody of someone for over ten days, so --

MR. RASKIN: That's incorrect.

THE COURT: All right. Well, that's the information I have from Pretrial. And in any event, you know, you were the ones that wanted to go forward today. And so, with the filing of the Complaint, I went ahead and issued it, although I had real concerns given what's set forth in the affidavit. So, what I'd like to do is at least get started on the detention hearing. If we then think that we can't conclude it today, we'll make that decision, you know, as we go along.

MR. RASKIN: That's fine, Your Honor. We're ready.

THE COURT: All right. Do you have information or witnesses or stipulations as to the Pretrial Report that you'd like to present to the Court?

MR. RASKIN: Yes. Just I'll start with the Pretrial Services Report because ultimately I'm sure I'll forget it. But we would offer to stipulate to the Pretrial Service Report, or at least that the testimony of the Pretrial Service officer would be consistent with the report she prepared.

MS. ALLEN: We would join in that stipulation, Your Honor.

THE COURT: All right.

1    MR. RASKIN:  We'd also offer the affidavit of Agent

2  Buono in support of the Complaint.  I would offer that his

3  testimony would be consistent with that affidavit on those

4  issues.

5    MS. ALLEN:  No objection to that, Your Honor.

6    THE COURT:  All right.

7    MR. RASKIN:  And with that, I would ask the Court's

8  permission to call Agent Buono as a witness.

9    THE COURT:  All right.  You may do so.

10    MICHAEL P. BUONO, GOVERNMENT'S WITNESS, SWORN

11                     DIRECT EXAMINATION

12  BY MR. RASKIN:

13  Q.  Good afternoon, sir.  Could you state your name and spell it,

14  please?

15  A.  Yes.  Michael, it's M-I-C-H-A-E-L.  My last name is Buono.

16  B as in bravo, U-O-N-O.

17  Q.  And what do you do for a living, sir?

18  A.  I'm an FBI agent.

19  Q.  How long have you been an FBI agent?

20  A.  I've been an FBI agent since 2012.

21  Q.  And where do you currently work?

22  A.  I currently work at the Kansas City Division.  And I work

23  counter-terrorism matters.

24  Q.  How long have you worked in Kansas City on those terrorism

25  matters?

1  A.  Approximately seven months in Kansas City.

2  Q.  And are you part of a squad that is a member of something

3  called the Joint Terrorism Task Force?

4  A.  Yes.

5  Q.  Tell us what JTTF is.

6  A.  Sure.  JTTF is the Joint Terrorism Task Force.  It's a bunch

7  of different government agencies that come together and jointly

8  work cases related to international terrorism.

9  Q.  Prior to working in Kansas City did you have any other posts

10  with the FBI?

11  A.  Yes.  I was a special agent in Milwaukee working the same

12  matter, counter-terrorism.

13  Q.  Okay.  Agent Buono, are you the case agent responsible for

14  the investigation of the defendant here in the courtroom?

15  A.  Yes.

16  Q.  And how is it that you first became familiar with Mr.

17  Mohamud?

18  A.  The FBI received a phone call from the Kansas City Police

19  Department on April 25th, where they reported that there was a

20  missing person.

21  Q.  And where did the KCPD get that information from?

22  A.  They received that information from Mohamud's mother, Dahabo.

23  Q.  Did you ultimately learn the defendant's whereabouts at or

24  around that time?

25  A.  Yes.

1  Q.  Where had the defendant gone?

2  A.  Through travel records we were able to identify that the

3  defendant had an airline ticket with the final destination of

4  Alexandria, Egypt.

5  Q.  And did you ultimately confirm that he was on that flight and

6  went to Egypt on the 24th?

7  A.  Yes.

8  Q.  And the defendant is a Kansas City resident as far as you

9  know.

10 A.  That is correct.

11 Q.  In the course of investigating the circumstances of Mr.

12 Mohamud's departure, did the FBI have occasion to identify his

13 employer and talk to an employee at that establishment?

14 A.  Yes.  We were able to interview an employee at Walmart.

15 Q.  And based on that interview, what did the FBI learn about the

16 circumstances of Mr. Mohamud's departure to the airport for this

17 flight to Egypt?

18 A.  Sure.  The defendant was scheduled to work at 1:00 p.m. to

19 either 9:00 p.m. or 10:00 p.m. shift.  And he left without

20 notifying the supervisor at approximately 1:30.  And that was

21 later determined by reviewing surveillance cameras at Walmart.

22 Q.  Did the employee at Walmart tell your colleagues anything

23 about Mr. Mohamud's behavior in the weeks preceding his

24 departure?

25 A.  Yes.  Apparently, according to the employee, the defendant

1  was having difficulties attending work, leaving and coming back

2  without notifying the supervisor, not showing up.  And it was

3  very odd behavior to the employee.  And then also the defendant

4  stated to employee that he -- when confronted that he had to go

5  and do something that he didn't want to do.

6  Q.  And, in fact, the employee indicated that the behavior was

7  such that the company was on the verge of firing Mr. Mohamud?

8  A.  That is correct.

9  Q.  The FBI also talked -- identified and talked to the taxi

10 driver who drove Mr. Mohamud to the airport, is that right?

11 A.  Yes.

12 Q.  What did you learn from the taxi driver?

13 A.  According to the taxi driver, he stated that the defendant

14 said he was going to Egypt for three months and that he found it

15 unusual because the only thing he had on his possession was a

16 backpack.

17 Q.  The FBI also talked to the defendant's family members,

18 correct?

19 A.  Yes.

20 Q.  What did the brother -- the defendant's brother and the

21 defendant's sister say about their concerns regarding the

22 defendant's whereabouts?

23 A.  They were concerned that he'd traveled to Iraq to fight with

24 the fighters and to engage in terrorist activities.

25 Q.  Did the brother also mention other things about the

1  defendant's behavior in recent weeks or months that he found

2  unusual?

3  A.  Yes.

4  Q.  The defendant locked a room, which is a garage, with a

5  padlock and kept to himself months prior and had minimal

6  communication with the family.  Also the brother stated that the

7  defendant had a PlayStation 4 and a laptop which were both wiped

8  prior to his departure on April 24th.

9  Q.  And when you say "wiped," what do you mean?

10 A.  As far as wiped as cleared and reset to the original factory

11 settings.

12 Q.  Eliminating any communications that might have previously

13 been on there?

14 A.  That's correct.

15 Q.  Have you had occasion to review the defendant's travel

16 records with respect to not only the flight he took to Egypt but

17 other flights that he had booked?

18 A.  Yes.  We were able --

19 Q.  What did you learn?

20 A.  Yes.  We were able to identify multiple tickets.  The first

21 ticket that we identified was a roundtrip to Canada in

22 approximately February 2017, which he never boarded.  Followed by

23 a roundtrip ticket to Alexandria, Egypt, in early April with a

24 return flight in May, which he never boarded.  And then the most

25 recent one which he did board was a roundtrip airfare from Kansas

1   City to Alexandria, Virginia, [sic] from April 24th to July 30th.

2   Q.  And were there return trip tickets books from Egypt as far as

3   you know?

4   A.  Yes.  We identified a one-way ticket back to the United

5   States, specifically Kansas City from Egypt.  And that was --

6   that reservation was made on the 26th for a -- April 26th for an

7   April 27th departure.

8   Q.  And then ultimately the defendant did fly back to the United

9   States arriving on May 4, is that correct?

10  A.  Well, just to backtrack, he never boarded the April 27th

11  flight.  And then he did board a flight for -- on May 3rd to

12  return back to Kansas City from Egypt.

13  Q.  Shifting gears slightly, in -- or you understand that the

14  defendant applied for a U.S. passport in January of 2017?

15  A.  Yes.

16  Q.  Around that same time did he also rent for the first time a

17  post office box?

18  A.  Yes.  He opened a post office box at the Antioch Post Office

19  and he used his driver's license and one other -- oh, and his

20  home address to secure the mailbox.  I'm sorry.

21  Q.  Now, once the defendant arrived in Egypt, is it your

22  understanding that at some point he was detained there by local

23  authorities?

24  A.  Yes.

25  Q.  And after that detention did the FBI have an opportunity to

interview the defendant in Cairo, Egypt?

A.   Yes.   The FBI was able to interview the defendant on May 1st.

Q.   Was he provided his *Miranda* warnings and did he waive those warnings?

A.   Yes.

Q.   The defendant during that interview discussed a note that he left for his family upon departure, is that correct?

A.   That is correct.

Q.   What did he say in that regard?

A.   In that note the defendant stated that he was traveling to meet the strangers.

Q.   And does that term used in that context have any meaning to you based on your experience as an investigator of terrorist activities?

A.   Yes.   But there are some unknowns with the term "strangers." Strangers has been utilized in ISIS and other foreign terrorist organizations' propaganda.   And the term "strangers" refers to individuals from foreign lands that are traveling to the Islamic State to fight.   So, that's why they're considered strangers and referred to as strangers because they're not from the Islamic State.

Q.   During the course of the interview being conducted by the FBI of the defendant in Cairo, did he provide consent for the FBI to search various electronic devices and social media sites where the defendant had been communicating?

A.   Yes.

Q.   And did the FBI proceed to conduct a search of some of those devices and some of those accounts?

A.   Yes, we were.

Q.   And without getting into all the detail of that, is there a principal conclusion that you and your colleagues drew from your preliminary analysis of those searches?

A.   Yes.  The principal conclusion would be that most accounts and devices have been, again, wiped clean.  However, on one social media account, which is a Facebook account, we were able to review a conversation between the defendant and another individual.  And to go into more detail about the conversation, the Facebook account that was utilized by the defendant or believed to be utilized by the defendant because of an e-mail account attached to it, stated that he wanted to travel to Syria to join the Syrian Mujahideen and that he also wanted to be a sniper.

Q.   Okay.  A couple follow-ups on that.  First of all, you -- was the FBI able to determine a date or a time frame for this communication that they found?

A.   That time frame was 2014.

Q.   Is it fair to say that communicate -- that there were no communications that the FBI found on any of these devices or in these accounts that were after that date?

A.   Not at this time.

Q.  So, any indication as to whether this is -- who the
participants in this conversation were?

A.  Yes.

Q.  What could you glean from what you found?

A.  As far as the Facebook communication, the defendant's e-mail
account was linked to a Facebook ID by the name of Jason Mason.
And Jason Mason was in communication with another individual
where Jason Mason shared his comments about the Syrian Mujahideen
and wanting to be a sniper.

Q.  Is it your belief based on your review of what the defendant
said in this interview in Cairo and your training and experience
that Jason Mason was an alias and that the defendant himself was
the one communicating over the account that he gave you?

A.  Yes.

Q.  And again, was it clear that the statement you referred to,
namely, "I am moving to Syria to join the Syrian Mujahideen," was
that clear that this was a statement made by the person using the
alias Jason Mason?

A.  Yes.

        MR. RASKIN:  Moving on, and I'm almost done, Your Honor.

        THE COURT:  Thank you.

BY MR. RASKIN:

Q.  It's your understanding, and I think you testified before
that the defendant took a flight from Egypt back to the United
States arriving on May 4th?

A.  Yes.

Q.  And the FBI was aware that he was returning?

A.  That's correct.

Q.  FBI agents meet the defendant at the airport in New York?

A.  Yes.

Q.  Did they conduct another interview of him in New York?

A.  Yes.

Q.  Regarding his reasons for traveling overseas, did the
statements that the defendant made in this second interview match
up or jibe with the statements he had previously made about the
strangers?

A.  Yes.  The interview in New York was consistent with the
statements he provided about wanting to join the strangers as he
provided in Cairo, Egypt.

Q.  Was he also asked about the former Al-Qaeda member, Anwar al-
Awlaki?

A.  Yes.

Q.  Why was he asked about that person?

A.  Because on Jason Mason's Facebook page he was liked and
that's why the FBI asked him questions about al-Awlaki.

Q.  The person using that account had indicated that he liked the
account of Anwar al-Awlaki?

A.  Yes.

Q.  And what then did the defendant say about this person?

A.  He was supportive of Anwar al-Awlaki's message and was also

1  supportive because of his children being killed and also the

2  struggle that sheiks don't recognize him as a sheik.

3  Q.  Okay.  Last question, Agent Buono.  Based on your experience

4  with the JTTF and the factors that you have set forth in your

5  testimony here today, what's going on here?  What is the FBI's

6  current belief as to what the defendant was doing traveling to

7  Egypt?

8  A.  I'm sorry to say we don't quite know at this time.  We are in

9  the process of investigating and trying to figure this out.

10  However, there are several behavioral indicators that the

11  defendant has shown that is consistent with an individual who

12  would want to commit a violent act related to terrorism.

13             MR. RASKIN:  No further questions, Your Honor.

14             THE COURT:  Ms. Allen.

15             MS. ALLEN:  Thank you, Your Honor.

16                         CROSS-EXAMINATION

17  BY MS. ALLEN:

18  Q.  Agent, you stated that Mr. Mohamud was found in Egypt in late

19  April, correct?

20  A.  Sometime after April 25th.

21  Q.  And it's your understanding that he traveled by April 24th,

22  correct?

23  A.  Yes.

24  Q.  And you just testified that he booked a flight out of Egypt

25  -- the flight was booked for the 27th, but was booked on April

1  26th, correct?

2  A.  That's correct.

3  Q.  So, from what you've looked at he traveled to Egypt on April

4  24th and two days later booked a flight home, correct?

5  A.  Yes.

6  Q.  Now, you stated he did not return home until, what was it

7  May, was it 3rd or 4th?

8  A.  He arrived last night in Kansas City.

9  Q.  Why was he held up and why didn't he leave on the 27th?

10  A.  I don't know.

11  Q.  Okay.  At some point was he detained in Egypt?

12  A.  Yes.  He was detained.  But how that was I have no idea and

13  the situation surrounding it I do not know.

14  Q.  And I guess what I want to try to clarify, and if you don't

15  know, you don't know, was did he not get on that flight on April

16  27th because he was detained in Egypt?

17  A.  We do not know.

18  Q.  Okay.  But you do know that he had booked a flight to leave

19  three days after he arrived?

20  A.  Yes.

21  Q.  Okay.  And that's not consistent with the statements that you

22  were talking about of staying three months, correct?

23  A.  No, but it is consistent with statements surrounding the

24  concern for us where one of the behavioral indicators is that a

25  -- someone who would want to go overseas and commit an attack

schedules different flights to disguise their true intentions and where they ultimately want to travel to.

Q. Let's be clear about what you know here. He has never stated to anyone that he planned to commit an attack, correct?

A. That's correct.

Q. You've not found anything on social media or on computers that he made any statements about planning -- commit any sort of attack, correct?

A. Through the state, that's correct.

Q. Okay. And from what you see he was voluntarily returning to the United States on the 27th?

A. Yes.

Q. Okay. Now, I want to discuss how this entire incident came to light. His family was actually the one who contacted the police and reported their concerns, correct?

A. They reported him as a missing person to the Kansas City Police Department.

Q. And you've just testified that they actually when interviewed had talked about having concerns about him traveling to fight in Iraq, correct?

A. Yes.

Q. So, in short, his family has been open with the authorities about their concerns?

A. That is not entirely true.

Q. Okay. Well, the family has expressed something, some

1  information to the authorities about concerns, correct?

2  A.   Some, but not all.

3  Q.   Now, at this point do you know if Mr. Mohamud still has a

4  passport?

5  A.   He does.

6  Q.   He does still have a passport?

7  A.   Yes.  But it's in our possession at this time.

8  Q.   Okay.  So, it exists, but he doesn't physically have the

9  passport?

10  A.   That's correct.

11  Q.   And would that passport be returned to him if he were

12  released?

13       MR. RASKIN:  Objection.  That would be part of the

14  Court's bail package, I would assume.  But I'm not sure this

15  witness knows the answer to that.

16       THE COURT:  Well, I guess what she's asking is would

17  they plan to return it to him.

18       MS. ALLEN:  And I --

19       THE COURT:  And I understand what you're saying.  The

20  Court can always direct that somebody's passport be taken to

21  Pretrial.  But right now the FBI has the passport.  So, objection

22  overruled.

23       THE WITNESS:  I have not thought of that at this time

24  and I do not know the answer to that.

25  BY MS. ALLEN:

1  Q.  Now, you stated that you looked at Mr. Mohamud's travel plans

2  and there were flights that were booked that he never took,

3  correct?

4  A.  Yes.

5  Q.  Obviously, he traveled here from Somalia when he was a child.

6  But other than that did you show any recent international travel

7  when you looked at his recent travel?

8  A.  No.  Nothing other than the ones we discussed.

9  Q.  So, really this flight to Egypt is the only time that he's

10 left the United States in recent years that you're aware of?

11 A.  Yes.

12 Q.  All right.  I have no further questions for you.  Thank you.

13          MR. RASKIN:  Briefly, Your Honor?

14          THE COURT:  Yes.

15                        REDIRECT EXAMINATION

16 BY MR. RASKIN:

17 Q.  Agent, you were asked on cross-examination questions about

18 whether -- questions about the shortness of or the potential

19 shortness of the defendant's stay in Egypt considering that he

20 booked a flight to come home on the 26th of April.  Do you

21 remember those questions?

22 A.  Yes.

23 Q.  Have you -- are you able to draw any investigative

24 conclusions based on your interviews here in Kansas City with the

25 family members about why the defendant booked a flight home on

1  the 26th?

2  A.  On one of the e-mail accounts that we reviewed, the family

3  attempted to reach out to Mohamud.  I don't know if they actually

4  reached out to him.  But they told him that the FBI was looking

5  for him, that he was under investigation, you need to come home

6  immediately.

7  Q.  And that's because you or your colleagues had talked to the

8  family members before the 26th, correct?

9  A.  Yes.

10  Q.  You were also asked about whether the FBI had found any

11  statements from the defendant about an attack or carrying out an

12  attack.  Do you remember those questions?

13  A.  Yes.

14  Q.  And specifically you were asked whether you had found any of

15  those types of statements on social media, is that correct?

16  A.  That's correct.

17  Q.  Again, what would -- did the FBI reach a preliminary

18  conclusion about the social media accounts they looked at and the

19  content that they were finding there?

20  A.  Again, this is a struggle for us because most of the social

21  media and e-mail accounts have been deleted.  However, the most

22  recent one in 2014 where he did share a concern with joining the

23  Syrian Mujahideen and wanting to be a sniper is a concern.

24  Q.  Right.  And you were also asked about the openness of the

25  family's communications with the FBI.  Did you learn during the

1  course of the investigation from the brother and others that the

2  defendant had been acting secretly in the months before his

3  departure?

4  A.   Yes.

5  Q.   And is it your belief that he was actually hiding his

6  activities from his family members?

7  A.   Yes.

8  Q.   So, in your investigative opinion, were the family members in

9  a position to provide as much evidence for you as you would have

10 hoped?

11 A.   Yes.   In regards to what they could have possibly known, yes.

12          MR. RASKIN:   Nothing further, Your Honor.

13          THE COURT:   Anything further?

14          MS. ALLEN:   I just have one clarifying question.

15                        RECROSS EXAMINATION

16 BY MS. ALLEN:

17 Q.   So, it's your understanding that Mr. Mohamud's family

18 contacted him and told him that the FBI wanted to talk to him or

19 was looking for him?

20 A.   Yes.

21 Q.   And it was after he learned that the FBI was looking for him

22 that he booked a flight back to the United States?

23 A.   I would have to refer to the e-mail communication for the

24 exact date on that.   I would hate to misrepresent that right now

25 because it is date specific and it's a small time frame.

1  Q.  But you agree that it's possible that that time frame would

2  match up?  That they informed him the FBI is looking for him and

3  then he books a flight to the United States?

4  A.  Yes.  Yes.

5  Q.  Okay.

6  A.  That's why it's a concern.

7  Q.  I have no further questions.

8  A.  Thank you.

9        MR. RASKIN:  Nothing further, Your Honor.

10 EXAMINATION BY THE COURT:

11 Q.  Okay.  I just have a couple of questions.  I want to make

12 sure I understand.  So, he left here on April 24th and arrived in

13 Egypt on the 25th?

14 A.  That's correct.

15 Q.  And do you know where he traveled in Egypt?

16 A.  According to the travel records he landed in Alexandria,

17 Egypt.

18 Q.  All right.  Did he make it out of the airport?  Did he travel

19 anywhere in Egypt?

20 A.  Yes.

21 Q.  And do you know how he came then back into custody of anyone?

22 A.  I don't know the details of what happened.  But information

23 was shared with us that he was located in Damietta.  I think I'm

24 pronouncing that correctly.  It's D-A-M-I-E-T-T-A.

25 Q.  And he was interviewed by the FBI in Cairo?

A.   That's correct.

Q.   And do you know how he got to Cairo to the FBI?  Did he

voluntarily go to their offices to be interviewed or do you know

how that transpired?

A.   I believe the FBI interviewed him at some location.  I don't

know the details to how that happened.

Q.   And then he got on a flight to the United States when?

A.   On May 3rd.

Q.   And he arrived in New York on May 4th?

A.   I'm sorry.  He might have departed May 4th and arrived May 4th

with the time difference.

Q.   Okay.  That would probably be right.

A.   Yeah.

Q.   Yeah.  Okay.

A.   Yeah.

Q.   But he arrived in New York on May 4th?

A.   Yes.

Q.   Okay.  And he arrived in Kansas City last night?

A.   Yes.

Q.   And so he was interviewed in New York?

A.   Yes.

Q.   And then when was his passport taken from him?  Was he

allowed to use it to travel to Kansas City?

A.   Yes.  His travel was voluntary.  He was interviewed by the

FBI in LaGuardia.  He originally landed at JFK.  And then they

1  interviewed him in LaGuardia.  And then the FBI agents

2  accompanied him on the Kansas City flight.  And then when he

3  deplaned, that is when multiple FBI agents were there to detain

4  him.  And at that time is when his passport was taken.

5  Q.  All right.  And so did the FBI transport him from JFK to

6  LaGuardia for the interview?

7  A.  I don't know that.

8          THE COURT:  Okay.  Any follow-up anyone wants to do?

9          MR. RASKIN:  No, Your Honor.

10         MS. ALLEN:  No, Your Honor.

11  BY THE COURT:

12  Q.  So, did he voluntarily return to Kansas City or did he come

13  to Kansas City because the FBI suggested that?  I mean, we're

14  talking about the flight risk issue here.  I'm just trying to

15  figure out what the agents' role in getting him back to Kansas

16  City was.

17  A.  Yeah.  I'm not sure what the exact roles were.  But I believe

18  the defendant purchased his own airplane ticket and was not in

19  detention at any time from when he departed Cairo to when he

20  landed in Kansas City.  And he was never in FBI's detention, you

21  know, prior to that.

22  Q.  Were there agents on the flight with him from Cairo to New

23  York?

24  A.  No.

25         THE COURT:  Okay.  Any follow-up anyone wants to do?

1            MS. ALLEN:  No, Your Honor.

2            MR. RASKIN:  No, Your Honor.

3            THE COURT:  Okay.  Thank you very much.

4            THE WITNESS:  Sure.

5            THE COURT:  All right.  Any argument that anyone wants

6    to make?

7            MR. RASKIN:  Yes, Your Honor.  And I'll keep it as brief

8    as possible given the hour.  We feel that there is a risk of

9    flight here that merits detention based on the highly suspicious

10   and unusual circumstances of the defendant's departure from the

11   United States to Egypt within the last several weeks.  That

12   combined with the circumstances Agent Buono talked about about

13   unusual behavior at work, unusual behavior at home, secrecy over

14   his conduct, wiping his social media accounts and various other

15   activities, when you combine that with an expressed desire to go

16   fight Jihad overseas going back to 2014, it is a fair inference

17   to draw that this is the defendant's intention.  And he has acted

18   on it once.  And if given the ability to do it once again, that

19   that is exactly what he will do.  And the facts, as elicited from

20   Agent Buono, I think speak loud and clear to his intention to do

21   so.  I would not suggest that that risk can be mitigated by

22   holding the defendant's passport given the fact that the FBI

23   believes that communications that have been deleted have been

24   with persons overseas who would be able to facilitate the

25   defendant's travel and in doing so, would be able to help him

1 secure travel documents to get out of the country.  These are the

2 types of questions that the FBI is continuing to investigate.

3 And, indeed, this is the reason that the Government asked for

4 more time here.  Lastly, I appreciate Your Honor's questions

5 about the defendant's travel back to the United States.  And I

6 know that Agent Buono was correct when he said that the defendant

7 was not in custody.  I think under the circumstances, given what

8 we believe the defendant knew from his family, that he was

9 clearly aware that the FBI was not only investigating him, but

10 monitoring his travel from Egypt.  That is certainly not the time

11 that the defendant would take flight.  We believe that that is

12 something that would occur once he's released and feels that the

13 FBI is no longer looking at him.  With that said, we believe that

14 there is a strong case for risk of flight here and move to detain

15 on that ground.

16          THE COURT:  And I just want to make sure that I

17 understand your position because you've just indicated that there

18 were some factors that you wanted to continue to investigate, but

19 by going forward today you didn't have that opportunity.  So, are

20 you asking for an opportunity to present further evidence on

21 Monday or Tuesday of this coming week?

22          MR. RASKIN:  Yes.

23          THE COURT:  All right.  Ms. Allen.

24          MS. ALLEN:  Your Honor, I also will try to keep this

25 brief.  I think we've had quite a bit of testimony.  I think

there's clearly conditions that can be put in place to ensure the
safety of the community and ensure Mr. Mohamud's appearance.  As
far as the safety of the community, I think the Government has
presented quite a bit of very speculative information about what
he was or wasn't doing.  But the bottom line is he is a 21-year-
old with no criminal history.  I also think it's important that
the Court take into account the nature of these charges, which is
that he put that he was traveling possibly to Canada on a
passport application and did not travel to Canada.  That in and
of itself is not violent or dangerous and they have not charged
with him anything regarding terrorism, regarding any sort of
violent or dangerous activity.  And so I think that's of great
significance.  If they did charge him with that, or they do
charge him with that, certainly that's something the Court could
take into account in the future.  But that's not what he's facing
today.  I think -- it seems to be that the overriding concern is
ensuring his appearance because of this overseas travel.  He
would be willing to forfeit his passport.  I've spoken to him
about that.  He would be willing to put up any money that he had
in his bank account for bond.  I also think there's factors about
this case that say that he would be -- his appearance would be
assured.  He's a 21-year-old who lives at home with his family.
And obviously you can see that much of his family is here.  His
family, they're the ones who called the police after he was
missing for just one day and reported what their concerns were.

1  So, I think the Court should have assurance that if staying with

2  his family, his family is -- they are going to make sure that he

3  appears and they're going to look after him because they've

4  already done that.  Secondly, any speculation that there are

5  individuals overseas that can somehow facilitate his travel

6  without a passport, we didn't hear any testimony about that.

7  There was no evidence that somehow he can have some mysterious

8  person facilitate overseas travel.  That just simply wasn't

9  information that was presented today.  And then I think it's of

10 great significance.  But he was in Egypt for what it sounds like

11 was one day before he booked a flight home.  And it appears that

12 he booked that flight home because he knew the FBI was looking

13 for him.  I actually think this is sort of contrary to the way

14 the Government sees it that this is some indication that he's

15 going to run.  If he knows that the FBI is looking for him and he

16 voluntarily returns to the United States, I don't know why we

17 would have a great concern that when he is being monitored by the

18 United States courts that that's the time that he is going to

19 then run back overseas without a passport and potentially without

20 money and with his family watching him.  I think there's

21 absolutely conditions that can be put in place to ensure his

22 appearance and we would ask for bond in this case.  Thank you,

23 Your Honor.

24         THE COURT:  All right.  Let me take a few minutes to

25 talk to Pretrial, and then I know we're kind of late in the day,

1  but we'll figure out what we're doing.  If the Court does allow

2  you to put on additional evidence on Monday or Tuesday of next

3  week, when do you want to do that, Mr. Raskin?

4          MR. RASKIN:  The longer the better.  So, Tuesday --

5          THE COURT:  All right.

6          MR. RASKIN:  -- anytime in the day.

7          THE COURT:  The first I'd be available Tuesday would be

8  at 2:30.  Are you available then, Ms. Allen?

9          MS. ALLEN:  Just one moment.  Let me grab my calendar.

10         THE COURT:  All right.

11         MS. ALLEN:  I believe I am, but I just want to check.

12  That would be the 9th?

13         THE COURT:  That would be the 9th.

14         MS. ALLEN:  I actually have a new case in front of Judge

15  Maughmer at 2:30, but that is my only obligation that day.

16         THE COURT:  Is that a detention hearing or --

17         MS. ALLEN:  It's a detention, arraignment, new case.

18         THE COURT:  How long do you think you'll need, Mr.

19  Raskin?

20         MR. RASKIN:  Well, I hate to give this answer, but it

21  depends.  You know, I mean, the team is working.  We'll be

22  working through the weekend and see what we get.  Look, I can't

23  imagine it's going to be a long time.

24         THE COURT:  All right.

25         MR. RASKIN:  Fifteen minutes.

1    THE COURT: So, I have something starting at 2:00.

2  Would you be available at one? Do you think between 1:00 and

3  2:00 is enough time?

4    MS. ALLEN: I'm available at 1:00.

5    MR. RASKIN: Yes, that's fine.

6    THE COURT: All right. Well, then I will at some point

7  talk to Pretrial. But what I'm going to do this afternoon is

8  take it under advisement, in large part because, you know, your

9  argument, Ms. Allen, is that there is certain evidence you

10  haven't heard such as evidence that he'd be able to get travel

11  documents and, therefore, would be a flight risk even if the

12  Court were to hold onto his passport. And obviously, you know,

13  one of the arguments Mr. Raskin has been making is that by

14  requiring him to present his evidence here today, he didn't have

15  it all. So, to the extent there is additional evidence that Mr.

16  Raskin wants an opportunity to present on the issue of flight

17  risk, which is what his motion addresses and what we're concerned

18  about, I'm going to allow him until Tuesday. And just because of

19  my schedule then, we'll set it for one o'clock if the parties

20  available. That means I'm taking it under advisement and

21  defendant will remain in custody pending further proceedings next

22  week. Obviously, the issue of probable cause is one that Judge

23  Maughmer will need to hear and I'll have him set that preliminary

24  hearing at a different time. But because I've started down the

25  road for detention issues, then rather than getting a transcript

1  and turning it over to Judge Maughmer on Tuesday, I'll just

2  conclude the hearing at that time.  All right.  Is there anything

3  else that we need to address?

4          MS. ALLEN:  No, Your Honor.

5          MR. RASKIN:  No, Your Honor.

6          THE COURT:  All right.  Pending further proceedings on

7  Tuesday at 1:00, defendant is remanded to the custody of the

8  Marshals.

9                  (Court Adjourned at 4:35 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INDEX

**WITNESSES FOR
THE PLAINTIFF:**

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Michael P. Buono | 11 | 21 | 27 | |

1

2

3

4

5

6

7            I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
8     above-entitled matter.

9

10          /s/ Lissa C. Whittaker      May 8, 2017
      Signature of transcriber         Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25