**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) Case No. 17-mj-00081-JTM-01 |
| | ) |
| **Plaintiff,** | ) **Kansas City, Missouri** |
| | ) **May 9, 2017** |
| **v.** | ) |
| | ) |
| **ISSE AWEIS MOHAMUD,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**TRANSCRIPT OF HEARING ON MOTION FOR
PRETRIAL DETENTION
BEFORE THE HONORABLE SARAH W. HAYS
CHIEF UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

For the Plaintiff:          Mr. Brian Casey
                            Assistant United States Attorney
                            400 E. Ninth St., Ste. 5510
                            Kansas City, MO  64106
                            (816) 426-3122

For the Defendant:          Ms. Carie Allen
                            Federal Public Defender's Off.
                            818 Grand Blvd., Ste. 300
                            Kansas City, MO  64106
                            (816) 471-8282

Court Audio Operator:       Ms. Traci Chorny

Transcribed by:             Rapid Transcript
                            Lissa C. Whittaker
                            1001 West 65th Street
                            Kansas City, MO  64113
                            (816) 914-3613

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1      (Court in Session at 1:11 p.m.)

2           THE COURT:  All right.  We're here on the case of *United*

3  *States vs. Isse Mohamud*, Case No. 17-mj-81.  If counsel would

4  state their appearance.

5           MR. CASEY:  Brian Casey appearing on behalf of the

6  United States, Your Honor.

7           MS. ALLEN:  Carie Allen for Isse Mohamud who appears in

8  person.

9           THE COURT:  All right.  We're here today for a

10  continuation of the hearing that we started last Friday.  Does

11  the Government have additional evidence?

12           MR. CASEY:  A short amount, Your Honor.

13           THE COURT:  All right.

14           MR. CASEY:  We'd like to --

15           THE COURT:  If you want to --

16           MR. CASEY:  We'd like to recall Special Agent Mike

17  Buono.

18           THE COURT:  All right.  Come forward.

19        MICHAEL P. BUONO, GOVERNMENT'S WITNESS, SWORN

20                    DIRECT EXAMINATION

21  BY MR. CASEY:

22  Q.  Good afternoon, Special Agent.  I know you testified on

23  Friday, but could you go ahead and please just restate your name,

24  spelling your last?

25  A.  Yes.  Michael Buono.  B-U-O-N-O.

Q.  And you testified on Friday about an investigation involving
the defendant in this case, correct?

A.  Yes.

Q.  Has the FBI taken additional investigative steps since
Friday?

A.  Yes.

Q.  Are some of those investigative steps things that the FBI
would not want to be public at this time?

A.  That's correct.

Q.  So, is your testimony today just some additional information
to assist the Court with regard to the particular issues being
raised with this detention hearing?

A.  Yes.

Q.  Okay.  And in that regard I'd like to -- drawing back to your
testimony on Friday about a Facebook account.  Do you recall that
testimony?

A.  Yes.

Q.  What additional information would you like to provide to the
Court with regard to that account?

A.  Sure.  After speaking with the interviewing agents, I was
informed that the defendant admitted to being Jason Mason on
Facebook and admitted to having his communications about wanting
to join the Mujahideen in Syria.

Q.  What interview was that, just to be clear?

A.  It was a Face -- it was an interview by FBI agents from the

1  Kansas City Field Office in New York City.

2  Q.  And have you had a chance to look at some of that Facebook

3  correspondence?

4  A.  Yes.

5  Q.  Could you please provide some of that to the Court?

6  A.  Sure.  I have this to reference, and I'll just get to the

7  specifics with the specific communication.  According to Jason

8  Mason stated, "I don't know that many brothers where I live in

9  America and it is a place full of disbelievers, so I don't get to

10 see that many brothers.  But I'm moving to Syria to join the

11 Syrian Mujahideen and fight against those who want Islam gone and

12 those who kick the Muslims from their homes, from those who

13 destroy the Muslim lands."  Jason Mason also stated, "I will do

14 that after I save enough money to go to Saudi Arabia and perform

15 the Umrah and then finish the Koran and learn Arabic, and then go

16 to Syria and join the Mujahideen.  Insha'Allah."  He also stated,

17 "Insha'Allah.  I will support them all.  And by the way, are

18 there Mujahideen who are not righteous there?  The Mujahideen who

19 are like the fighters who fought by the prophet."  The other

20 individual on Facebook stated, "There's a hadith that says,

21 'However supports Mujahideen by weapon or money, he will be like

22 him, rewarded.'"  Jason Mason replied, "Interesting.  I will

23 support them in the best way I can.  Insha'Allah.  And I will

24 join them and fight by them."  Jason Mason also said, "I'm

25 thinking about becoming a sniper.  Insha'Allah."

1  Q.  When was that correspondence dated?

2  A.  It was on April 24th, 2014.

3  Q.  Did you have prior testimony about what was found in that

4  account after that date?

5  A.  Yes.  And that was the communications were deleted.

6  Q.  Recalling back to what you just read to the Court, was there

7  sort of a preparation list that you read?

8  A.  Yes.

9  Q.  What did your investigation disclose about -- since 2014 when

10  that was written, what the defendant had done on that list?

11  A.  In regards to, "I will do that after I save enough money,"

12  through the course of the investigation we found that he has

13  saved $10,000 through working.  As far as going to Saudi Arabia,

14  he admitted to an FBI agent that he knew someone in Saudi Arabia.

15  And then he also informed someone in the community that he

16  intended to travel to Saudi Arabia.  In regards to "Finish the

17  Koran," there are at least three individuals that we identified

18  as the defendant attempting to convert them to Islam.  And one of

19  those individuals stated that he is the most radical Muslim he

20  has ever met.

21  Q.  Was there anything about learning Arabic that your

22  investigation disclosed?

23  A.  I'm sorry.  Yes.  And in regards to the Arabic, there were

24  books and literature at the house that was consistent with him

25  learning Arabic.

Q.  Could you describe that a little more, please?

A.  The books, it was like educational books and how to write Arabic and things like that.

Q.  During his interview with the FBI agents in New York, what else did he say that would be relevant to your prior testimony about indicia of mobilization, radicalization?

A.  Sure.  He referred to Anwar al-Awlaki as Sheik Anwar during the interview.  That's a concern for the FBI because Anwar al-Awlaki is the external operational or was the former external operational commander for Al-Qaeda in the Arabian Peninsula.  He also admitted to subscribing to the YouTube channel that Anwar al-Awlaki -- a YouTube channel that's for Anwar al-Awlaki.

Q.  Was there any other information you learned during interviews relevant to this proceeding?

A.  Yes.

Q.  Was one information have -- was some of that information from a travel agent?

A.  Yes.

Q.  What did you learn?

A.  On two separate occasions through an interview, a travel agent said -- recommended that we take his passport from him.

Q.  What was the context?

A.  It was in regards to travel over to the Middle East and that it didn't sound quite right as far as the reason why he was going and that he recommended that passport be taken.

Q.  Okay.  What did you learn from a computer repairman?

A.  We learned that the defendant took a computer -- a laptop to

get repaired for a cracked screen.  And the repairman found it

very odd that the defendant would not leave sight of that

computer while it was being repaired.  The computer -- you know,

typically you take a computer and drop it off and come back when

it's fixed.  But he wanted to be in sight and the computer remain

-- the computer repairman found it very odd.

Q.  And lastly, did you -- since Friday have you had continuing

interviews with the defendant's family?

A.  Yes.

Q.  Is there anything you learned from those interviews you'd

like to share with the Court?

A.  Yes.  One of the family members stated, "If I were you, I

would keep an eye on him."

Q.  And what was that a reference to?

A.  That was in reference to if the defendant was released.

Q.  And would this have been one of the family members the

defendant would have likely lived with upon his release?

A.  Yes.  It as a close family member.

          MR. CASEY:  Nothing further, Your Honor.

          THE COURT:  All right.  Ms. Allen.

                    CROSS-EXAMINATION

BY MS. ALLEN:

Q.  Agent, I want to clarify a little bit about these Facebook

1  statements.  Were these statements -- I believe we had this

2  testimony last time that these were from 2014, is that correct?

3  A.  That's correct.

4  Q.  Okay.  So, these are not recent statements involving the

5  Mujahideen?

6  A.  Yes.

7  Q.  Okay.  Now, as part of this investigation have you searched

8  the family's home?

9  A.  No.

10  Q.  Have agents gone through the family's home, looked through

11  anything?

12  A.  Yes.

13  Q.  Okay.  Were any firearms found in the home?

14  A.  No.

15  Q.  Were any sort of dangerous items, you know, short of regular

16  household items found in the home?

17  A.  No.

18  Q.  Okay.  Was there -- have there been any evidence found of Mr.

19  Mohamud planning something dangerous or something along those

20  lines?  I'm not talking about travel.  I'm talking about planning

21  something else.

22  A.  Again, anything we would suspect that was used to plan has

23  been destroyed or wiped.

24  Q.  So, there hasn't been anything found?

25  A.  That's correct.  To this date that's correct.

1  Q.  Are you aware that Mr. Mohamud doesn't have a driver's

2  license?

3  A.  I was not aware of that.

4  Q.  You're aware that he doesn't have a car?

5  A.  Yes.

6  Q.  But he actually traveled to and from work because his mother

7  took him to and from work.  Were you aware of that from

8  interviews?

9  A.  And his father also.

10 Q.  So, he relied on his family for transportation?

11 A.  Yes, from what I know.

12 Q.  And I think we've covered this fairly thoroughly in the first

13 hearing, so I don't want to belabor it.  But as far as this case

14 sort of originated, his family called in and reported a missing

15 person, correct?

16 A.  Yes, to the Kansas City Police Department.

17 Q.  And then they -- before they were contacted by the FBI, the

18 family further called in and said they had concerns about him

19 being involved with bad people or something along those lines.

20 And that's when the FBI got involved?

21 A.  No.  The Kansas City Police Department notified the FBI.

22 Q.  Okay.  But you're aware that that information came from his

23 family?

24 A.  As far as -- can you please repeat that?

25 Q.  As far as being concerned about the nature of his travel?

A.  Yes.  A couple family members were concerned that the travel

was related to terrorist activities.

Q.  And there are, I think, seven family members who live in that

home, is that correct?

A.  Yes.

Q.  And from my understanding from you they've been cooperative

and they've provided you with information and they have

participated in interviews, correct?

A.  That is incorrect.

Q.  Have they not been cooperative with you?

A.  That's correct.

Q.  Okay.  Who has not been cooperative with you?

        MR. CASEY:  Your Honor, I'm going to object on

relevance.  We've kind of tried to keep some of the details of

various family members kind of out this in part on a ground that

there might be some -- the agent may say some things that would

tend to incriminate some family members.  We've tried to keep

that out of this hearing.  So --

        THE COURT:  Well, here's the problem.  I mean, you've

brought up the family members and what some of them said.  And I

think that, unfortunately, you know, opens the door.  If you

think something needs to be testified to not in public record, we

have to talk about whether we were willing to do that.  But, you

know, you talked about family members saying if he were released,

you know, we'd be concerned and we'd want you to keep an eye on

1  him and some other testimony.  So, I mean, I think she's entitled

2  to inquire.

3          MR. CASEY:  I understand, Your Honor.

4          THE COURT:  You may proceed.

5  BY MS. ALLEN:

6  Q.  Have you interviewed his mother?

7  A.  Yes.

8  Q.  Okay.  And has she been cooperative with you?

9  A.  No.

10  Q.  And why is it you believe she hasn't been cooperative with

11  you?

12  A.  Well, it's difficult to know for sure at this point because

13  of some statements that she's made of the story have been

14  gradually changing as more evidence has come to light.  But there

15  was a letter that the defendant admitted to leaving.  And it is

16  my belief at this point that the mother was aware of that letter

17  and she was at least one of two individuals who initially saw

18  that letter.

19  Q.  And you've been told about that letter.  You testified about

20  that at the last hearing, correct?

21  A.  Yes.  But I did not speak into detail about that letter.

22  Q.  But the family did tell you about the letter?

23  A.  When confronted and when we began to interview and

24  interrogate.

25  Q.  All right.  I have no further questions for you.

1      THE COURT:  Anything further?

2      MR. CASEY:  No, Your Honor.  Not from the United States.

3      THE COURT:  I have some further questions that may or

4  may not have been asked on Friday.  Any objection if the Court

5  kind of re-asks?  I mean, I hope they're not duplicative, but I'm

6  just confused about some of the testimony from last week.

7      MR. CASEY:  Not from the United States, Your Honor.

8      THE COURT:  All right.

9  EXAMINATION BY THE COURT:

10 Q.  I want to go back to -- what day did the defendant arrive in

11 Egypt?

12 A.  It was either April 25th or April 26th.  He departed here on

13 April 24th.  And I'm pretty sure he arrived in Alexandria on

14 April 25th, according to the flight itinerary.

15 Q.  All right.  And on April 26th, he booked a flight back to the

16 United States?

17 A.  Yes.  That is -- there is a record of that travel being

18 booked on that day.  And that was for a departure on April 27th.

19 Q.  And at the time he booked that ticket on April 26th, had he

20 been interviewed by anyone in Cairo?

21 A.  Not --

22 Q.  Or anywhere in Egypt?

23 A.  I don't know.

24 Q.  Well, you talked about some interviews that had happened in

25 Egypt.  Do you recall that?

1  A.  Yes.

2  Q.  And when did that occur?

3  A.  I know the FBI interviewed him on May 1st.

4  Q.  And do you know, did they ask him about when he planned to

5  return to the United States?

6  A.  I don't recall the details regarding that in the interview.

7  Q.  Well, I mean, when you say you don't recall the details, I

8  mean, is that something that they asked him about?

9  A.  I don't recall.  I'm sorry.  I don't know.

10  Q.  Well, when did he get on the flight to return to the United

11  States?

12  A.  I believe it was May 3rd.  And he arrived back in the United

13  States -- well, no.  I think it was May 4th and he arrived back

14  in the United States on May 4th.

15  Q.  Yeah.  And what can you tell us about the circumstances

16  surrounding his getting on the flight back to the United States?

17  A.  In what regards?

18  Q.  Well, in any regards.  I mean, this whole hearing is about

19  flight risk.

20  A.  Okay.

21  Q.  That's the basis on which the Government is asking that he be

22  detained.  Not as a danger, but as a flight risk.

23  A.  Right.

24  Q.  And so I'm trying to ascertain what the circumstances were

25  that caused him to get on a flight to come back to the United

States.

A. Yeah. I'm unaware of how and who was involved with having the defendant return to the United States. I am unaware of what was discussed behind doors. But I am under the impression, like I testified on Friday, that he left Egypt voluntary and he purchased his own plane ticket.

Q. All right. And anything else you know about the reasons he returned to the United States?

A. I can't think of specific details in regards -- I don't know if the Egyptian government wanted him -- you know, wanted him out of their country. I don't know. I don't know the details behind it.

Q. Well, did someone other than the FBI interview him in Egypt?

A. It was -- it's under my impression with the interview that FBI Cairo did with the defendant that he was interviewed by Egyptian authorities.

Q. And do you know if they shared the contents of their interview with the FBI?

A. I have not seen any intelligence or content based, you know, from any interview conducted with the defendant.

Q. Well, you may not have seen any content, but do you know whether the Egyptian authorities shared information they received from interviewing the defendant with the FBI?

A. The FBI has not been in any receipt of information surrounding that interview or the details of his detainment.

1  Q.  He was detained in Egypt?

2  A.  I believe so, at a hotel.

3  Q.  By who?

4  A.  By the Egyptian authorities.

5         THE COURT:  All right.  Any follow-up anyone wants to

6  do?

7         MR. CASEY:  Not from the United States, Your Honor.

8         MS. ALLEN:  No, Your Honor.  I do have a proffer that

9  may help clarify the travel issues.

10        THE COURT:  All right.  Thank you.  All right.  Thank

11  you.

12        THE WITNESS:  All right.  Thank you.

13        THE COURT:  All right.  Thank you very much.  All right.

14  Does the Government have any additional evidence?

15        MR. CASEY:  No, Your Honor.

16        THE COURT:  All right.  Ms. Allen?

17        MS. ALLEN:  Your Honor, we would proffer that if Mr.

18  Mohamud were to testify, he would testify that he arrived in

19  Egypt and booked a flight back home approximately within 24 hours

20  of arriving.  That flight was booked prior to any contact with

21  authorities in any way.  And he was little unsure on dates.  But

22  at approximately the 26th or 27th, it was before his flight had

23  left, he was taken into custody by Egyptian authorities.  And he

24  remained in their custody and then the FBI arrived and they

25  interviewed him in Egypt.  So, he had planned to take the flight

out on the 27th, but was taken into custody by Egyptian

authorities prior to that flight leaving. And then he

voluntarily left on the next flight he was allowed to leave on.

Which I believe -- we have those dates from the previous hearing,

but it was, I think, May 3rd.

THE COURT: All right. So, the Egyptian authorities,

your proffer would be, turned him over to the FBI?

MS. ALLEN: Essentially. That appears to be what

happened.

THE COURT: Is it your contention he was in the custody

of the FBI?

MS. ALLEN: He was in the custody of the Egyptian

authorities. I'm not sure that he was in the custody of the FBI.

I know that he bought his own ticket and he did leave

voluntarily.

THE COURT: All right. And do you have any objections

to that proffer?

MR. CASEY: No, Your Honor. Only just to clarify that

he was not in the custody of the FBI until he arrived in Kansas

City, Missouri, the night of, I believe, May 4th when he was

arrested on the current complaint.

THE COURT: All right. Any other evidence from either

side?

MR. CASEY: No, Your Honor.

MS. ALLEN: No, Your Honor.

1    THE COURT: And any argument that either side wants to
2 make?

3    MR. CASEY: Yes, Your Honor, if I may? Your Honor, I
4 know this was a question to Mr. Raskin on Friday. Just to
5 clarify, the United States is moving under both prongs for
6 detention.

7    THE COURT: Well, what's the statutory authority for
8 moving under both prongs?

9    MR. CASEY: Well, Your Honor, I took a look at it and I
10 pulled some case law to confirm it, but I didn't have time to
11 make copies or get a brief to the Court. I apologize. But the
12 way the statute works is §3142(f) and (e) are supervisions that
13 work independently. And so §3142(f) creates the -- it lists
14 basically seven conditions that need to be made for someone to be
15 detained at all. And our provision in this case is
16 §3142(f)(2)(A), serious risk that such person will flee. And so
17 the Court needs to make a determination whether there is a
18 serious risk that the person will flee. But that determination
19 is analytically different. It's just an entirely distinct
20 determination from the determination under §3142(e), that is,
21 that there are no conditions of release that would ensure the
22 defendant's appearance or safety of the community. And so those
23 are -- they're basically -- one is the threshold question. One
24 gets us in the door for detention and that's the (f). And the
25 United States submits that there is more than sufficient evidence

1   that this individual is a serious risk of flight. And at that

2   point the Court needs to then make the two separate inquiries

3   under (e), that is, are there conditions that would ensure the

4   safety of the community and conditions that would ensure his

5   appearance in court. And in a case I found, the only -- I found

6   a little bit of circuit law out of the Tenth Circuit. And this

7   was an unpublished opinion that's available online at 570 Fed.

8   Appx. -- so, F-E-D. A-P-P-X. 819. It's a 2014 case from the

9   Tenth Circuit named *United States vs. Gerkin*. And in that case,

10  they do -- they don't decide it on that issue. They say that the

11  District Court needs to make a better record. But they do say

12  it's possible that -- and I'm reading -- I'm going to read, "The

13  existence of a serious flight risk is the predicate for a

14  detention hearing under §3142(f)(2)(A), but it does not alone

15  justify detention. Under §3142(e)(1), judges can order detention

16  only if they find that no condition or combinations of conditions

17  will reasonably assure community safety and appearance in court.

18  If the district judge meant the finding of a serious flight risk

19  to support the ultimate detention decision, that is also

20  problematic."

21          THE COURT: Of course, I want to look at that. And I

22  have the cite here because what you're reciting to me about they

23  must find community safety and appearance. And of course we know

24  it's an or.

25          MR. CASEY: We know it's or. That's right, Your Honor.

1    And in --

2         THE COURT:  So, I mean that -- if you're reading as it's

3    written, that's the first problem, but.

4         MR. CASEY:  Well, it then goes on to say, "First, the

5    magistrate judge ordered Mr. Gerkin detained based on a finding

6    of danger to the community, not flight risk.  Although the

7    District Court could shift the rationale for detention from

8    community danger to flight risk, he should explain why and make

9    factual findings to support that determination."  So, it's

10   allowing that you could make either.  You detain on either

11   determination.  It's just saying under this case, we don't have a

12   record to decide.  And I have some other law that sort of goes

13   through a two-step analysis that I can provide the Court.

14        THE COURT:  And if you have the cites, because I know

15   Ms. Allen will want to take a look at them, too.

16        MR. CASEY:  Yeah.  Another case that I was able to pull

17   that I think lays the two-step nature of the analysis out very

18   well is a case out of the -- one of the Iowa districts, out of

19   the Northern District of Iowa by Judge Reade.  And it's a *United*

20   *States vs. Smith*.  The citation is 2017 WL 1731711.  And I

21   thought that was kind of a useful case under the Eighth Circuit

22   authority sort of explaining this two-step nature.  And, you

23   know, what I found in my research, though, and I think what

24   applies to this case is we're moving under both prongs and I

25   believe the Court could find detention under either prong.  But

1 usually the cases find that the person is a flight risk and that

2 would be appropriate in this case.

3      THE COURT:  But I don't see how you're moving under both

4 prongs.  I mean, --

5      MR. CASEY:  Well, Judge, I think once we -- or once we

6 get to the detention hearing, once we meet the predicate of

7 §3142(f), in which case this case the serious risk of flight is

8 our predicate, then the Court under (e) makes the determination

9 about the conditions of release under either the appearance or

10 under safety -- danger to the community.

11      THE COURT:  All right.  But in terms of your moving, the

12 only way that you can move under right -- the way that I read the

13 statute is that they are a risk of flight?

14      MR. CASEY:  Right.  The serious -- yeah.  That there's

15 a --

16      THE COURT:  So, you can't move under both prongs.

17      MR. CASEY:  Well, we're under (f).  When I speak of both

18 prongs, I mean the determination under (e).  The Court could

19 detain him finding either that there are no conditions of release

20 that would assure his appearance, or that there are no conditions

21 that would assure safety of the community.  And we believe that

22 there are -- the Court could make that finding under either of

23 those.  We think that there is a preponderance of the evidence

24 that there are no conditions that would ensure his appearance.

25 And speaking to that in the first instance, I know Ms. Allen made

a point of indicating that, you know, defendant doesn't have a driver's license, he doesn't have a car, he relies on his parents to get around. But the general facts are he's not so dependent. He planned covertly to travel overseas and was able to that. And he was able to get the ground transportation, the flight transportation. He was able to obtain his passport. He was able to take visa documents, all without his family knowing. And this is the exact same living conditions he's going to be moving back to, into this, you know, communal family home. And he still was able to make very significant covert planning to facilitate his own travel. And, you know, his ties to the community are pretty limited. I mean, through his own willingness to just sort of pick up and disappear from his family, it shows that these family ties really don't have any tie to the community. I think the testimony from Friday indicated this is an individual who is isolated, you know, kind of a loner. And he really doesn't have these ties to the community that typically the Court would look to to say that he would stay. And there's a lot of, you know, behavioral indicators, you know, that the Court -- that the agent spoke to on a Friday that, you know, indicated that this is someone with, you know, real motivation. We're still figuring out what those motivations are, but they're real motivations, you know, to get overseas and there's at least a significant reason to believe -- join a foreign firing group. And I think on top of that, you know, we have the family, the family, the people that

he's going to stay with, at least one member of that family expressed the FBI needs to be concerned about this guy. They need to keep an eye on him. So, there is still some real concern here even by the people he's asking to stay with. And I think under all of that, you know, that evidence shows beyond a preponderance that he is a -- he is a risk of flight and no conditions of release would ensure his appearance in court. On the danger to --

THE COURT: Well, before you move onto the danger, is there anything you want to say about the fact that he returned to the United States voluntarily?

MR. CASEY: Your Honor, he, as I think this proffer indicated, you know, he was in Egyptian custody and, you know, I think that that fact significantly informs, you know, what his decision was in terms of whether to return to the United States or not.

THE COURT: Well, the proffer was that he had booked a return ticket before he was ever interviewed or ever taken into Egyptian custody.

MR. CASEY: That's correct, Your Honor. And I don't have -- I don't have evidence to say that that's different. I don't know, however, whether the family had communicated with him telling him that, you know, the FBI has been at our door asking about you. Because he would have booked a flight after the family had turned him in as a missing person. And on that same

1  day, both KCPD and FBI had started extensive interviews, so.

2  THE COURT: Well, do you think it makes a difference? I

3  mean, I don't know exactly the date, I'll have to go back and

4  look at the transcript. There was testimony that the family sent

5  him an e-mail saying the FBI is looking for you or investigating

6  you and you need to come home. If someone comes home and

7  responds to that kind of an e-mail what does that say about their

8  risk of flight?

9  MR. CASEY: Well, I think what we really can't say is

10 whether he would have come on. He booked a lot of flights that

11 he didn't take. And I believe that the special agent's testimony

12 was that one sort of indicia of travel, one of these behavioral

13 indicators they look at is this sort of booking flights and sort

14 of confusing your itinerary. So, if his family contacts him and

15 says the FBI is looking for you, one way he could have thought he

16 was getting the FBI off his tail was to book a flight home that

17 he never intended on taking. So, I believe that actually cuts

18 both ways. And because we now know that he was in Egyptian

19 custody, we really can't say whether he would have boarded it or

20 not.

21 THE COURT: But you're not contending the Egyptians took

22 him to the airport and caused him to come home?

23 MR. CASEY: Your Honor, I have no comment on that. I'm

24 sorry.

25 THE COURT: Well, when you say you have no comment, I

1  mean, no evidence one way or the other?

2          MR. CASEY:  I have no evidence one way or the other.

3          THE COURT:  All right.

4          MR. CASEY:  In regard to the dangerousness prong, I

5  think the key here is the defense wishes defendant's charge was

6  not an end in itself.  It's a means.  It's a means to something

7  else.  He was trying to facilitate his own travel.  And there is

8  reason to think that that travel was to join a foreign fighting

9  group.  And that's a significant step for someone to take and

10 shows us something inside the defendant's head that there is a

11 desire for violence that, in this type of radicalization case,

12 doesn't just go away.

13         THE COURT:  Well, I guess my question would be I'd

14 appreciate any argument you want to make about what danger he

15 poses to this community.  I don't know that the Court can take

16 into account what danger he might pose to the Syrian community in

17 Syria.  I mean, I think it has to be either the community here or

18 in the United States.

19         MR. CASEY:  I believe that's right, Judge.  But I think

20 he does pose a significant -- I think you cannot discount the

21 conduct.  And I think once, you know, there are several cases --

22 and I apologize that I didn't bring one with me -- but there are

23 several cases to discuss once this sort of radicalization and

24 sort of terrorist motive takes place, it doesn't give up very

25 quickly.  And here is an individual that, you know, we had

testimony about, you know, someone commenting, well, he's the most radical person I've ever met. And he made the affirmative steps to, you know, covertly get overseas. We can't at this point say exactly what his purpose was. But there's a lot of reason to think that that purpose was to join -- was to join the fight. And he's back home and there's a lot of reason to think he's going to bring that fight back home. And there's really no conditions of release that would stop that. Because that would require the type of, you know, 24-hour monitoring that would basically create a private prison for this individual. And cases are very clear that Pretrial Services does not need to go to that. If that's the type of conditions that you're considering, then that's too much, then that's an opportunity to detain the individual. And I think as a danger to the community, that would be completely appropriate under these facts.

THE COURT: When you say that there are a lot of reasons to think he is bringing the fight back home, what is it about this defendant and his conduct that causes you to stay that?

MR. CASEY: It's the -- it's what appears to be since 2014, he has sort of increasingly, you know, planned to and prepared for a violent Jihad. And his original plan was to do it overseas. It got thwarted. That's just not something you give up overnight. This is someone who still believes that, whether for religious reasons or other reasons, that violent Jihad is the route to go. And that is something that we just can't discount.

1 And I don't think there's any conditions of release that would

2 protect the community from someone who, if they're willing to

3 just pick up arms, can go do it.

4          THE COURT:  Okay.

5          MR. CASEY:  Thank you, Judge.

6          THE COURT:  All right.  Ms. Allen.

7          MS. ALLEN:  Your Honor, I'll try to keep this short and

8 not political.  I'd ask the Court to rely on what he's charged

9 with and the evidence we heard and not what it is some pretty

10 radical speculation that the Government is going to.  I think,

11 first of all, the most important thing here is just looking at

12 flight risk.  The bottom line is Mr. Mohamud absolutely is

13 willing to forfeit his passport.  And based on the charge alone,

14 he may not even have a passport anymore because that may not be

15 considered a valid passport.  But even if not, he can forfeit his

16 passport.  I know last time we were here Mr. Raskin said

17 something about the idea of -- that someone might be able to

18 provide him -- we've heard no evidence of that, that he has any

19 access to some sort of fake passport or way out of the country.

20 He doesn't have a car.  He doesn't have a driver's license.  He

21 has money that he would be willing to put up for bond.  And while

22 we're not asking for this, if the Court thought it was necessary

23 to put him on GPS monitoring, I've spoken with Mr. Mohamud, he

24 said he would do GPS monitoring.  His mother and sister came and

25 met with me.  And the family is willing to do whatever needs to

be done to have him released. And they would be willing to help

Probation in any way, shape, or form. I think there's seven of

them there that live in that house. They're the people that

called the police in the first place. I mean, bottom line is Mr.

Mohamud isn't going anywhere. And he's not going to have the

means to go anywhere. He's not going to have a passport. He

doesn't have a car. He's not going to have the ability to run.

And I think it's incredibly telling what we've laid out in this

case that he went to Egypt. He booked a ticket home before any

authorities contacted him. The only reason he didn't get on that

flight is because Egyptian authorities took him into custody. He

was going to get on that flight on the 27th. And I know the

Government has speculated otherwise. But there's no evidence

otherwise. That ticket was booked. We know that his return to

the United States was voluntary. That's what the FBI said, he

wasn't in custody. He came back to the United States when he did

not have to answer to these charges, or to answer the

investigation. At that point there wasn't a charge, but he knew

the FBI was interested in him. I don't know what is more telling

to say that he is not a flight risk than the fact that he

returned from overseas when this all happened. And he did that

on his own. The only other thing I want to say is that there has

been no evidence that he has interest in violent Jihad. And

there's -- statements made on Facebook about Syrian fighting in

2014 is not evidence that he is somehow interested in violent

1　Jihad in the United States.  And I do take issue with that.  I

2　think under -- even under both prongs if the Court went there, he

3　absolutely could qualify for bond.  But as far as just

4　considering the flight risk, there is no question that conditions

5　can be put in place that will secure his appearance in court and

6　that he is not a flight risk.  Thank you, Your Honor.

7　　　　　THE COURT:  All right.  Well, at least one case has been

8　cited to the Court that I will need to take a look at.  Well, I

9　guess two cases.  The Northern District of Iowa case, as well as

10　the case at 570 Fed. Appx. 818 out of the Tenth Circuit.  I think

11　it is important for the Court to know just what has to be

12　established before it can look at both prongs of the statute

13　where this is clearly a case where they were moving under the

14　flight risk prong.  So, I will try -- and I think I'm in court

15　all afternoon -- but in between proceedings I'll try to take a

16　look at that.  If I'm not able to get that done this afternoon,

17　then I'll do it promptly tomorrow and let the parties know.

18　Okay.  Is there anything further that we need to address?

19　　　　　MR. CASEY:  Not from the United States, Your Honor.

20　　　　　MS. ALLEN:  No, Your Honor.

21　　　　　THE COURT:  All right.  We'll be in recess.

22　　　　　　　　(Court Adjourned at 1:51 p.m.)

23

24

25

1

2                          **<u>INDEX</u>**

3

**<u>WITNESSES FOR</u>**
4 **<u>THE PLAINTIFF:</u>**        **<u>DIRECT</u>**      **<u>CROSS</u>**        **<u>REDIRECT</u>**   **<u>RECROSS</u>**

5 Michael P. Buono      2           7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7           I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
8   above-entitled matter.

9

10          /s/ Lissa C. Whittaker           May 10, 2017
            Signature of transcriber              Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25