# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 17-00172-01-CR-W-DGK |
| ISSE AWEIS MOHAMUD, | |
| Defendant. | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER

The Government respectfully requests that this Court deny the defendant's motion under 18 U.S.C. § 3145(b) for revocation of an order of the Honorable Sarah W. Hays, United States Magistrate Judge, directing that the defendant be detained pending trial as a serious risk of flight.

The motion is wholly without merit. Judge Hays's ruling was supported by the record of a long detention hearing at which the Government presented substantial evidence to prove not only the likelihood of flight, but also the danger to the community if the defendant were released on bond. The hearing evidence, which revealed the defendant's recent and alarmingly suspicious travel to Egypt, left little doubt that the defendant's aim was to join a foreign terrorist organization. The defendant himself revealed in a 2014 electronic conversation that he planned to go to Syria to join the Mujahideen and fight, possibly as a sniper. The defendant then prepared for his trip to Egypt by deleting years of subsequent electronic communications and behaving in ways

that prompted his family to fear he would engage in jihadist activities. When the defendant left town, he did so without a word of notice to his family or employer, and he returned only after Egyptian authorities detained him in Cairo. Releasing the defendant on bond, under these facts, would not have been appropriate, as the record overwhelmingly established that the defendant posed both a risk of flight and a danger to the community. In other words, there is no reason to disturb Judge Hays's detention order and the defendant's motion should be denied.

## I. Procedural History

On the morning of May 5, 2017, the Government filed a criminal complaint charging the defendant with one count of passport fraud, in violation of 18 U.S.C. § 1542. (D.E. 1.) The defendant had been arrested the prior evening by the Federal Bureau of Investigation ("FBI") upon his return to Kansas City from Egypt.

Shortly after filing the complaint, the Government moved for the defendant's pre-trial detention pursuant to 18 U.S.C. § 3142(f)(2)(A). (D.E. 2.) In addition, the Government moved to continue the detention hearing under the provision of § 3142(f) that permits detention of the defendant for up to three days where the government seeks additional time. (D.E. 3.)

On the afternoon of May 5, 2017, Judge Hays convened the detention hearing, notwithstanding the Government's motion for a continuance. (D.E. 5.) The Government objected, explaining that the requested continuance was customary and particularly important in this case where the FBI was in the midst of gathering evidence bearing on

detention. (Tr. I, at 4-6.)[1] Judge Hays commenced the detention hearing, taking evidence that included the testimony of the FBI case agent and hearing argument from the parties. Judge Hays then continued the hearing, after confirming that the Government still wanted additional time to prepare (Tr. I, at 32).

On May 9, 2017, the detention hearing resumed and the Government presented additional evidence through the FBI case agent. (D.E. 10.) Judge Hays took the matter under advisement, ordering that the defendant remain in custody pending her detention ruling.

On May 11, 2017, Judge Hays issued a written decision ordering that the defendant be detained pending trial, under 18 U.S.C. § 3142(f)(2)(A) and 3142(e), upon findings that the defendant presented a serious risk of flight and that no condition of release could ensure the defendant's appearance in this case. (D.E. 12.)

On May 17, 2017, after taking evidence at a preliminary hearing, the Honorable John T. Maughmer, United States Magistrate Judge, found probable cause to exist that the defendant had committed the passport fraud violation charged in the criminal complaint. (D.E. 14.)

On June 1, 2017, a grand jury in this district returned the instant Indictment, charging the defendant with one count of passport fraud, in violation of 18 U.S.C. § 1542. (D.E. 16.) The charge alleges violations of both prongs of the statute — namely, that the

---

[1] "Tr. I" refers to the transcript of the detention hearing convened on May 5, 2017. (*See* D.E. 7). "Tr. II" refers to the transcript of the detention hearing convened on May 9, 2017. (*See* D.E. 11). "Compl. Aff." refers to the affidavit dated May 5, 2017 in support of the criminal complaint in this case. (*See* D.E. 1.)

defendant (i) made a false statement in an application for a U.S. passport with intent to induce the passport's issuance, and (ii) used a passport that was secured in any way by reason of a false statement.

The defendant is detained pending trial, a date for which has not yet been set.

## II. The Detention Hearing

At the detention hearing, the Government called one witness, Special Agent Michael P. Buono of the FBI, who testified at length on both May 5 and May 9. The Court took judicial notice of an affidavit previously submitted by Agent Buono in support of the criminal complaint. Certain proffers of the defendant though counsel were accepted by the Court without objection from the Government. In addition, the parties stipulated to the contents of the Pretrial Services Report. The evidence established the following.

The defendant is a 22-year-old naturalized U.S citizen, born in Mogadishu, Somalia. Since in or about 2006, the defendant had resided with his family in Kansas City, Missouri.

On April 25, 2017, the FBI learned from the Kansas City, Missouri Police Department that the defendant's mother had reported that the defendant was a missing person. (Tr I, at 12.) The FBI determined that on the previous day, April 24, 2017, the defendant had left Kansas City on a commercial flight to Alexandria, Egypt. (Tr. I, at 13.)

The FBI then interviewed numerous people in the Kansas City-area who reported concern about the defendant's pre-departure behavior.

- An employee at the defendant's workplace, Walmart, said that on April 24, the defendant abruptly left in the middle of his scheduled shift, without notifying his supervisor. (Tr. I, at 13.) The employee added that in the preceding weeks the defendant's behavior had become troublesome, to the point where he was on the verge of being fired. (Tr. I, at 14.) The employee noted that the defendant had difficulties attending work, including unexcused absences. (Tr. I, at 14.) The defendant's response when confronted, according to the employee, was that "he had to do something that he didn't want to do." (Tr. I, at 14.)

- A taxi driver, who picked up the defendant at Walmart on April 24 and drove him to Kansas City International airport, recalled that the defendant said he was travelling to Egypt for three months. (Tr. I, at 14.) The driver said the defendant had with him only a backpack, which the driver found to be unusual for a person embarking on a three-month trip. (Tr. I, at 14.)

- The defendant's brother and sister expressed concern that the purpose of the defendant's travel to Egypt was to join the "fighters" in Iraq and engage in terrorist activities. (Tr. I, at 14, 23.)

- The defendant's brother further explained that the defendant "wiped" electronic communications from a PlayStation 4 account and a laptop, meaning that the defendant had cleared and reset those devices to their factory settings. (Tr. I, at 15.) The defendant also curtailed communications with the family in the month before his departure, according to the brother, who explained that the defendant "kept to himself" in the garage, entry to which he prevented by locking the door with a padlock. (Tr. I, at 15.)

- A travel agent with whom the defendant had discussed his travel plans recommended that the FBI take the defendant's passport away from him. (Tr. II, at 6.) The travel agent was concerned because the defendant's reason for travelling abroad "didn't sound quite right." (Tr. II, at 6.)

- A computer repairman who fixed a broken screen on the defendant's laptop said he found it "very odd" that the defendant would not allow the laptop out of his sight while it was being repaired. (Tr. II, at 7.)

The FBI obtained a copy of an application for a U.S. passport that the defendant submitted on January 27, 2017, at the Gladstone Station Post Office, 7170 North Broadway, Gladstone, Missouri. (Tr. I, at 16; Compl. Aff. ¶ 5.) In response to a question on the application asking what countries were to be visited by the applicant, the defendant stated "Canada." (Compl. Aff. ¶ 5.) The defendant attached to the application a confirmed travel itinerary for a roundtrip flight from Kansas City, Missouri to Vancouver, Canada, departing on February 8, 2017 and returning on February 15, 2017. (Compl. Aff. ¶ 5.)

Further FBI investigation revealed that the defendant did not travel to Vancouver as indicated on the itinerary. (Tr. I, at 15; Compl. Aff. ¶ 6.) The FBI also learned that the defendant booked an unused roundtrip airline ticket for an early-April 2017 flight to Alexandria, Egypt, with a return late-May return to Kansas City. (Tr. 1, at 15.) The flight that the defendant actually took to Alexandria, Egypt, on April 24, 2017, was a roundtrip ticket with a return flight to Kansas City on July 30, 2017. (Tr. I, at 16.)

On April 26, 2017, within 24 hours of his arrival in Egypt, the defendant booked a return flight to Kansas City, scheduled to depart the next day, April 27. (Tr. I, at 16; Tr. II, at 15-16.) Egyptian authorities detained the defendant before that flight departed. On May 3, 2017, after the Egyptians released him, the defendant voluntarily flew back to Kansas City, through New York City. (Tr. I, at 16; Tr. II, at 15-16.)

On May 1, 2017, the FBI interviewed the defendant in Cairo, Egypt, while the defendant was in Egyptian detention and after the defendant waived *Miranda* rights. (Tr. I, at 16-17.) In response to questions regarding the content of a note that the defendant

left for his family prior to his departure, the defendant stated that he wrote in the note that he was travelling to meet the "strangers." (Tr. I, at 17.) Agent Buono of the FBI, who was not present for the interview in Cairo, testified that ISIS and other foreign terrorist organizations have used the term "strangers" in their propaganda material to refer to individuals from foreign lands who are travelling to the Islamic State to fight. (Tr. I, at 17.) In the interview on May 1, the defendant also provided consent for the FBI to search various electronic devices and social media accounts that the defendant had used to communicate with others. (Tr. I, at 17-18.)

The FBI's searches revealed, principally, that most of the devices and accounts had been "wiped clean" prior to the defendant's departure for Egypt. (Tr. I, at 18.) The FBI found an email postdating the defendant's departure in one of the accounts; that email was sent to the defendant from his family, stating that the FBI was looking for the defendant and he should return home at once. (Tr. I, at 25-26.) The FBI first spoke with the defendant's family prior to April 26, 2017, when the defendant booked a return flight from Egypt that he was unable to use by virtue of his detention in Cairo. (Tr. I, at 26.)

Of the few other communications the FBI found in its searches, the most recent was an April 24, 2014 electronic conversation on one of the defendant's social media accounts between the defendant, using the alias "Jason Mason," and an unknown party. (Tr. I, at 18-19; Tr. II, at 3-4.) Agent Buono summarized an excerpt of this electronic conversation, starting with a statement of the defendant:

> [The defendant] stated, "I don't know that many brothers where I live in America and it is a place full of disbelievers, so I don't get to see that many brothers. But I'm moving to

> Syria to join the Syrian Mujahideen and fight against those who want Islam gone and those who kick the Muslims from their homes, from those who destroy the Muslims lands." [The defendant] also stated, "I will do that after I save enough money to go to Saudi Arabia and perform the Umrah and then finish the Koran and learn Arabic and then go to Syria and join the Mujahideen. Insha'Allah."

(Tr. II, at 4; see also Tr. I, at 18-19.)

Agent Buono also summarized the unknown participant's response and the defendant's reaction:

> The other individual . . . stated, "There's a hadith that says, 'However (sic) supports Mujahideen by weapon or money, he will be like him, rewarded.'" [The defendant] replied, "Interesting. I will support them in the best way I can. Insha'Allah. And I will join them and fight by them." [The defendant] also said, "I'm thinking about becoming a sniper. Insha'Allah."

(Tr. II, at 4.)

FBI investigation revealed steps taken by the defendant consistent with the preparations the defendant described in this social media conversation with the unknown participant. The FBI learned, for example, that the defendant had saved earnings of approximately $10,000. (Tr. II, at 5.) The defendant told the FBI that he knew someone in Saudi Arabia and, prior to his departure for Egypt, he told a person in Kansas City that he intended to travel to Saudi Arabia. (Tr. II, at 5.) Three people in Kansas City told the FBI that the defendant was trying to convert to Islam, and one of those people described the defendant as the "most radical Muslim he [had] ever met." (Tr. II, at 5.) The FBI seized books and literature belonging to the defendant that were aids for learning the Arabic language. (Tr. II, at 5-6.)

On May 4, 2017, the defendant returned to the United States on a commercial flight to New York City, where he agreed to be interviewed by FBI agents after being advised of and waiving his *Miranda* rights. (Tr. I, at 20; Compl. Aff. ¶ 7.) The agents asked the defendant about the U.S. passport application filed on January 27, 2017. The defendant said he applied for the passport with the intention of travelling to Egypt. (Compl. Aff. ¶ 7.) The agents asked if the defendant considered travelling to any country other than Egypt when he filed the application; the defendant said no. (Compl. Aff. ¶ 7.)

Agents also asked the defendant for his views on Anwar al-Awlaki, the deceased external operatations commander for al Qaeda in the Arabian Peninsula, a foreign terrorist organization. (Tr. I, at 20; Tr. II, at 6.) The agents raised the subject because the defendant had indicated on a social media platform that he "liked" the account of al-Awlaki. (Tr. I, at 20.) The defendant said he was supportive of al-Awlaki's message, referring to him as "Sheik Anwar." (Tr. I, at 20.) The defendant admitted that he was subscribed to a YouTube channel devoted to al-Awlaki. (Tr. II, at 6.)

Finally, Agent Bouno testified that based on the investigation to date, the FBI assessed the defendant as a potential security risk, because he had exhibited behavior that was "consistent with an individual who would want to commit a violent act related to terrorism." (Tr. I, at 21.)

### III. The Detention Order

In her cogent order of detention, issued in writing on May 11, 2017, Judge Hays thoroughly examined the extensive evidence received at both sessions of the detention hearing. Measuring that evidence against the factors enumerated in 18 U.S.C. § 3142(g),

Judge Hays concluded that the defendant was a risk of flight and that no condition or combination of release conditions would reasonably assure the defendant's appearance in court as required. (D.E. 12, at 1-3.)

First, Judge Hays recognized the defendant's close family ties to the Kansas City area. Normally a fact weighing in favor of release, here Judge Hays discounted the defendant's family ties because the defendant "travelled to Egypt without telling his family that he was leaving." (D.E. 12, at 2.) Judge Hays found, moreover, that the family were the ones who "reported [the defendant] missing when he failed to return home from work." (D.E. 12, at 2.) Two of the family members, as Judge Hays pointed out, had even "expressed concern" that the defendant's travel to Egypt "was related to terrorist activities."

Next, Judge Hays examined the evidence suggesting that the defendant had for several years "contemplated leaving his home to join a foreign terrorist organization" and that the defendant "had taken significant steps to bring his plan to fruition." (D.E. 12, at 2.) In this regard, Judge Hays found that the defendant had: (1) saved money "to finance his travel expenses"; (2) obtained books in an effort to "learn the Arabic language"; (3) developed "contacts" abroad; (4) obtained a U.S. passport; (5) "delet[ed] communications" from his social media accounts and electronic devices; and (6) travelled to Egypt. (D.E. 12, at 2.)

Judge Hays analyzed the nature and circumstances of the charged offense, as called for under § 3142(g)(1), finding that the factor weighed against release. Judge Hays explained that the alleged false statement in the defendant's passport application —

namely, that he falsely claimed he was going to Canada — could be viewed "as an attempt to hide his actual plans and motivation for travel," describing it as "yet another step towards achieving his goal to leave this country to join a foreign terrorist organization." (D.E. 12, at 2-3.)

On this record, Judge Hays was convinced that the Government had met its burden of establishing that the defendant was a flight risk who must be detained pending trial. Judge Hays explained her analysis of the evidence as follows:

> Defendant's long-held goal to leave this country to join a foreign terrorist organization, as well as his recently displayed ability to carry through on his plan by covertly leaving his home for overseas travel, causes the Court to find by a preponderance of the evidence that there is a serious risk defendant will flee if released on bond.

(D.E. 12, at 3.)

The Government had also moved for detention on the alternate ground that the defendant would pose a danger to the community if released on bond. (D.E. 2.) Judge Hays ruled that this argument was precluded by § 3142(f), which she concluded authorized a detention hearing on the instant passport fraud charge only on risk-of-flight grounds. (D.E. 12, at 1-2.)

## IV. <u>Argument and Authorities</u>

This Court should deny the defendant's motion under 18 U.S.C. § 3145(b) for revocation of the detention order. The evidence, when gauged against the legal standards set forth below, establishes that the defendant was properly detained by Judge Hays as a risk of flight and could also have been detained as a danger to the community. The defendant offers no new evidence or argument justifying his release.[2]

Under the terms of the Bail Reform Act, 18 U.S.C. § 3141, *et seq.*, a defendant shall be detained pending trial if, after a hearing, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). To determine whether such conditions exist, courts consider evidence regarding: (i) the nature of the circumstances charged; (ii) the weight of the evidence against the person; (iii) the history and characteristics of the person, including whether the person was on other release pending trial at the time of the charged offense(s); and (iv) the nature and seriousness of the danger to any person of the community that would be posed by the person's release. *Id.* § 3142(g). To justify detention, the government must show by a preponderance of the evidence that no such conditions will reasonably assure the defendant's appearance, or by clear and convincing evidence that no such

---

[2] Section 3145(b), which governs a motion for revocation of a magistrate judge's detention order, provides: "If a person is ordered detained by a magistrate judge ... the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly." 18 U.S.C. § 3145(b). This Court reviews detention orders under a *de novo* standard. *See, e.g.*, *United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir.1985) (en banc) (discussing § 3145(b)).

conditions will reasonably assure the safety of the community. *See United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003).

    A.    **The Defendant Is a Risk of Flight**

The Government established by a preponderance of evidence that no condition(s) of release will reasonably assure the defendant's appearance in court. The evidence, in fact, overwhelmingly proved that the defendant was a risk of flight. The defendant had for years planned to "join the Syrian Mujahideen and fight against those who want Islam gone." (Tr. II, at 4.) He committed to "support them in the best way I can," to "join them and fight by them." (Tr. II, at 4.) The defendant saved money, tried to learn Arabic, hid his activities from his family, deleted years of electronic communications, applied for a passport stating he was going to Canada, and then abruptly left for Egypt in the middle of his work shift, without telling his employer, his friends, or even his family. When the family learned of the defendant's whereabouts, two members were quick to conclude that the defendant had left to engage in terrorist activities. In sum, the evidence of the defendant's conduct and behavior — his long-held desire to travel abroad to fight, the depth of his commitment, his actions in support of the plan, and his efforts to conceal the plan — amount to proof in abundance that the defendant poses a risk of flight.

The defendant's arguments to the contrary, all of which Judge Hays heard, have no more merit on this motion. The defendant's voluntary return to the United States (D.E. 15, at 3), for example, has diminished significance in light of the surrounding circumstances, which included the family's email to alert the defendant that the FBI was involved and the defendant's detention in Egypt. In this context, it is fair to infer that the

-13-

defendant came home because he had been caught, and he knew that if did not return he would be caught again. Nor should the Court give any weight to the defendant's challenges to the strength of the evidence — namely, that proof of an attack plan and the purpose of his travel was absent (D.E. 15, at 3) and that proof of his foreign contacts was limited only to one person in Saudi Arabia (D.E. 15, at 6). The evidence was sufficient even in the absence of the cited material but, even so, an adverse inference should be drawn from the defendant's robust deletion of his electronic communications that he prevented the FBI from finding the type of evidence he now complains that the FBI does not have. Likewise, the claim that the family would adequately "supervise" the defendant if released (D.E. 15, at 5) carries little credence given what has transpired here, including how unwitting the family was of the defendant's plan and departure, and their less-than-complete cooperation with the FBI to date (Tr. II, at 10-11).

Lastly, the defendant claims he has little incentive to flee, because the evidence of passport fraud is weak and his sentencing exposure is slight. (D.E. 15, at 5.) The argument should be rejected on multiple grounds. First, the defendant is not in a position credibly to assess the Government's evidence: the Indictment was returned only recently; discovery has not yet been produced; and the investigation is ongoing (*see* Tr. I, at 4-6, 9). Second, the defendant overplays Judge Hays's "significant concerns" about the affidavit in support of the complaint. The concerns did not prevent a finding of probable cause to issue the complaint and, in any event, the Indictment later return by the grand

jury is an entirely separate matter.[3] The defendant's sentencing argument fails to recognize that the statutory exposure is up to 10 years' imprisonment. It also discounts the ongoing nature of the investigation and the potential applicability of the terrorism enhancement under the U.S. Sentencing Guidelines, *see* U.S.S.G. § 3A1.4(a), which could dramatically alter sentencing exposure.

### B. The Defendant Is Also a Danger to the Community

Contrary to Judge Hays's ruling, the defendant may also be detained on grounds that he poses a danger to the community. Section 3142 creates a two-step analysis for pretrial detention: first, the court must decide whether, pursuant to § 3142(f), the defendant can be detained; and second whether, pursuant to § 3142(e), "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142; *see also United States v. Smith*, No. 17-MJ-111-LRR, 2017 WL 1731711 at *2-*3 (N.D. Iowa May 3, 2017) (explaining the "two-step inquiry" of 18 U.S.C. § 3142). There is nothing in the statute that ties the first step to the second — that is, the statute does not say that the basis for detention eligibility (here, "serious risk that such person will flee" pursuant to § 3142(f)(2)(A)) dictates which of the detention *grounds* may be considered (flight or safety). That is for good reason. It would make little sense for a court to be unable to detain a person in the face of clear and convincing evidence of dangerousness simply

---

[3] In addition, Judge Hays's comments related only to the prong of 18 U.S.C. § 1542 requiring intent to induce the passport's issuance. They did not relate to an alternative basis for the charge faced by the defendant under the prong of the statute criminalizing use of a passport secured in any way by reason of a false statement. (*See* D.E. 16.)

-15-

because the person had ample ties to the community.[4] The plain language of the statute does not support that result.

Here, there is clear and convincing evidence that no condition(s) of release will reasonably assure the safety of the community upon the defendant's release. The implication of the defendant's conduct and behavior is that he intended to join a foreign terrorist organization and engage in unspecified terrorist activity abroad. Evidence establishing the depth of the defendant's commitment to these goals, and long-standing efforts to attain them, suggests a substantial risk that the defendant will continue to pursue his aims if released, perhaps in altered form. The possibility of an act of terrorism, however remote, is a risk that bond conditions cannot mitigate in any meaningful way. Simply put, the nature of the danger suggested by the evidence makes the defendant's release untenable. The defendant's lack of criminal history (D.E. 15, at 5) and the absence of firearms in his residence (D.E. 15, at 4) do not alter the calculus.

---

[4] There is no Eighth Circuit precedent on point, and cases are split on the issue. *Compare United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988) (holding that detention based on dangerous can only be ordered when detention is sought under § 3142(f)(1)), *and United States v. Himmler*, 797 F.2d 156 (3d Cir. 1986) (same), *with United States v. Gerkin*, 570 Fed. Appx. 819, 822 (10th Cir. 2014) ("The existence of a serious flight risk is the predicate for a detention hearing under § 3142(f)(2)(A), but it does not alone justify detention. Under § 3142(e)(1), judges can order detention only if the find that no conditions or combination of conditions will reasonably assure community safety and appearance in court."), *United States v. Demmler*, 523 F.Supp.2d 677, 681 (S.D. Ohio 2007) (distinguishing *Ploof* and *Himmler* and evaluating "dangerousness through the prism of § 3142(f)(2)"), *and United States v. Crawford*, No. CR10-00041-PJH, 2015 WL 163817 at *2 (N.D. Cal. Jan. 12, 2015) (ordering, in a revocation of supervised release case, that defendant eligible for detention as a risk of flight under § 3142(f)(2)(A) be detained as a flight risk and as a danger to the community). With no binding precedent to the contrary, the plain language of the statute governs, and this Court can, and should, order the defendant detained under dangerousness prong as well.

## V. Conclusion

Accordingly, for all of the foregoing reasons, the Government respectfully requests that this Court deny the defendant's motion to revoke the order of detention.

Respectfully submitted,

THOMAS M. LARSON
Acting United States Attorney

By   */s/ David Raskin*

BRAIN P. CASEY
DAVID RASKIN
Assistant United States Attorneys

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on June 16, 2017, to the CM-ECF system of the U.S. District Court for the Western District of Missouri for electronic delivery to counsel of record.

*/s/David Raskin*
David Raskin
Assistant United States Attorney